IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Arturo Ramirez,<br><br>    Defendant. | No. CR 07-1060-TUC-JMR (GEE)<br><br>**REPORT AND RECOMMENDATION**<br><br>Motion to Suppress |

The District Court referred this case to the Magistrate-Judge for a hearing on the defendant's Amended Motion to Suppress. [doc. #40] A hearing on the motion was held on Friday, February 29, 2008. Upon consideration of the evidence presented at the hearing and the arguments of respective counsel, the Magistrate-Judge recommends the District Court deny the defendant's Motion to Suppress. The defendant's arrest was supported by probable cause.

**Indictment:**

The defendant is charged in a superceding indictment with conspiracy to transport and harbor illegal aliens; harboring illegal aliens for profit; and aiding and abetting bringing in illegal aliens for profit, in violation of Title 8, United States Code §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(iii), 1324(a)(1)(B)(i), 1324(a)(2)(B)(ii), and Title 18, United States Code § 2.

## EVIDENCE:

### U.S. Border Patrol Agent Louis Ayala

Louis Ayala is an agent of the United States Border Patrol with nine years experience. On May 6, 2007, he received a tip that illegal aliens were staying in room 241 of the Super 8 Motel in Nogales, Arizona. The next morning, Ayala set up surveillance of the room. Ayala saw a Chevy Tahoe drive up and park near the room. The driver entered the room and, a short time later, came out accompanied by several individuals. When the driver and the individuals drove away in the Tahoe, Ayala requested the assistance of other agents. These agents later informed Ayala that the occupants of the Tahoe were all illegal aliens.

Ayala then went to the front desk and spoke to the manager. The manager asked Ayala to go to room 241 and see if any other illegal aliens were staying there. Ayala went to the room and discovered 14 more illegal aliens. Ayala called for additional assistance and returned to the front desk.

When Ayala was near the front door of the motel, the manager came to him and said "at that particular moment an individual was paying for – for that room – for room number 241." She further said he was paying in cash, and he was paying for two rooms.

Ayala observed the man at the front desk and noted he was carrying a duffel bag. He instructed Agent Carlos Ramirez to conduct surveillance on this individual.

Ayala identified the defendant as the man he saw at the front desk.

### U.S. Border Patrol Agent Carlos Ramirez

Carlos Ramirez is an agent of the U.S. Border Patrol with eight years of experience. When Ayala discovered illegal aliens were staying at the Super 8 Motel, he requested assistance, and Ramirez was one of the agents who responded. Ramirez initially assisted Ayala by "maintaining surveillance of the area."

At one point, Ayala pointed out to Ramirez a man who paid for the room where the illegal aliens were staying. Ramirez identified that man as the defendant.

Ramirez followed the defendant from a distance. At one point, the defendant looked at Ramirez and "gave a look of surprise." Ramirez explained, "I tried to blend in as a guest, and I wasn't able to." Ramirez then observed the defendant enter one of the rooms of the motel. The door to the room was open and just outside was a cleaning lady and her cleaning cart. Ramirez requested assistance, and Agent Garcia responded.

Agents Ramirez and Garcia entered the room and talked to the defendant and the cleaning lady. The cleaning lady told the agents the room was not occupied, and the men had to leave.

The defendant "pulled out two keys and he told the lady, 'I rented out this room; these are the keys that the manager gave me; I rented out room 490.'" The cleaning lady then explained the motel has no room 490, and they were all in room 340. The cleaning lady tried the two electronic keys in the lock; neither would open the door.

Ramirez and Garcia then identified themselves as Border Patrol agents. The defendant identified himself as a U.S. citizen. He reached for his "man bag" and presented his documentation to Ramirez. Ramirez asked the defendant if the large duffle bag was his, and the defendant said it was.

Ramirez asked the defendant for permission to search the duffle bag. The defendant gave his permission, and Ramirez searched the bag for weapons. He found none.

Ramirez and Garcia escorted the defendant downstairs. At first, they approached room 241, but the agents decided to avoid that area and took the defendant away from the motel by another route.

Ramirez transported the defendant and his duffle bag to the border patrol station. Ramirez and Garcia attempted to interview the defendant, but he refused to answer any questions. The agents then inventoried the bag in front of the defendant in accordance with their standard procedures. They found socks, a t-shirt, deodorant, a sealed package, a cell phone, Mexican currency, Mexican birth certificates, Mexican passports, Mexican driver's licenses, a voter registration form, a gold chain and other jewelry.

On cross-examination, Ramirez acknowledged that his testimony is contradicted by the report written by agent Ayala. That report states that while Ramirez was following the defendant, the defendant hesitated outside room 104 and then entered room 490. Ramirez conceded the motel has no room 490.

The defense introduced into evidence a surveillance tape recording of the motel's lobby. The tape recording shows agent Ramirez walk through the lobby before the defendant approaches the front desk and conducts his transaction. This tape recording contradicts Ayala's initial testimony that the defendant paid for room 241 before Ayala summoned Ramirez to help with the surveillance of the defendant. Ramirez testified he arrived at the motel earlier, before Ayala found additional illegal aliens in room 241. He walked through the lobby and around the motel "to try to blend in as a guest."

### *U.S. Border Patrol Agent Louis Ayala – redirect*

On redirect, Ayala testified he was certain the manager pointed the defendant out to him, but conceded he did not remember where the conversation took place. After that conversation, while the defendant was still at the front desk, Ayala stood directly behind the defendant pretending to be in line so he would be able to recognize the defendant later. The surveillance tape recording shows Ayala standing behind the defendant.

Ayala acknowledged his report states that the defendant hesitated before room 104 and then entered room 490. He conceded the hotel has no room 490. He explained he put in his report information given to him by other agents.

### *Investigator Gilbert Duron*

Duron is a licensed private investigator with nine years experience. He was employed by the defendant in connection with this case. Duron interviewed Miss Greed, the clerk at the Super 8 Motel. Miss Greed recognized a picture of the defendant. She never told anyone who paid for room 241. Hotel records indicate a Dagoberto Perez paid for room 241 in cash

on May 4th. Hotel records indicate the room was paid for by a Jose Perez from the 4th until the 7th. The records further indicate the defendant paid for room 104 on May 7th. Duron did not interview the hotel manager.

### *The defendant, Arturo Ramirez*

The defendant, Arturo Ramirez, is a carpenter and landscaper. The defendant testified he went to the Super 8 Motel and paid for one night's stay. He was assigned to room 104.

The defendant went to room 104 with his duffle bag and found it was being cleaned. An agent told him that was not his room and escorted him out. He left his bag in room 104. The agent escorted the defendant to room 241 where people were exiting. The defendant suspected those people were illegal aliens. The agent then took the defendant into room 241.

The agent then took the defendant back to room 104 where he retrieved his duffle bag. Then, he was escorted to the border patrol station. Out of his presence, the agents opened his duffle bag and removed his things. They then showed the defendant his bag and the things they said they found inside.

### Discussion: Seizure

The court first considers whether the defendant's seizure complied with the Fourth Amendment. An investigative stop of limited duration is allowed if there is a reasonable suspicion the suspect has committed a crime. *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion is determined from the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Diaz Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002), *cert. denied*, 538 U.S. 934 (2003).

An arrest occurs when a person remains seized beyond the period necessary for a limited investigative stop. *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). An arrest requires probable cause which exists "when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair

1  probability that the defendant had committed a crime." *United States v. Garza*, 980 F.2d 546,
2  550 (9th Cir. 1992) (internal punctuation removed).
3        Once a valid arrest has been made, a search incident to arrest may be made of the area
4  within the arrestee's immediate control if it is performed "roughly contemporaneously with
5  the arrest." *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Tank*, 200 F.3d
6  627, 631 (9th Cir. 2000).
7        Once a valid arrest has been made, the government may conduct an inventory search
8  "to protect an owner's property while it is in the custody of the police, to insure against
9  claims of lost, stolen, or vandalized property, and to guard the police from danger."
10 *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see also, United States v. Burnette*, 698 F.2d
11 1038, 1049 (9th Cir.) ("once an item in an individual's possession has been lawfully seized
12 and searched, subsequent searches of that item, so long as it remains in the legitimate
13 uninterrupted possession of the police, may be conducted without a warrant"), *cert. denied*,
14 461 U.S. 936 (1983).
15       Based on the content of the testimony presented and the demeanor of the witnesses,
16 the court will credit most of the information supplied by the agents. The court credits the
17 agents' testimony that illegal aliens were found in room 241. The court further credits
18 Ayala's testimony that the manager told him the person at the front desk was paying for room
19 241 and another room in cash. The manager was in a position to obtain this information and
20 had no reason to lie to the agents. It is possible she was mistaken, but that is irrelevant for
21 the purposes of the instant motion. The court credits Ayala's testimony that he stood behind
22 the defendant so he would be able to identify the defendant later. The court further credits
23 Agent Ramirez' description of his surveillance of the defendant, his testimony concerning
24 his encounter with the defendant in room 340, and his testimony that the contents of the
25 duffle bag were inventoried in accordance with standard procedures.
26       The court assumes for the purposes of this motion that the defendant was arrested
27 when Ramirez and Garcia identified themselves to the defendant in room 340 as Border
28

Patrol Agents. The court concludes the agents had probable cause to arrest the defendant at that time.

When the defendant was arrested, the agents knew (1) room 241 was being used to house illegal aliens, (2) the defendant paid for room 241 and another room; (3) after the defendant noticed he was being observed by Agent Ramirez, he walked into room 340, which was opened and being cleaned; (4) he insisted he was in his assigned room – room 490; (5) he had two key cards, neither of which opened room 340; and (6) the hotel has no room 490.

The agents knew room 241 was being used to house illegal aliens. The manager told the agents that the defendant paid for that room. It was reasonable for the agents to rely on the manager's statement and assume a manager would be privy to this information. The manager's statement that the defendant had rented two rooms was supported by the discovery that the defendant had two key cards. Her statement that the defendant had rented the room being used to house illegal aliens was further supported by the defendant's strange behavior entering a room he had not rented and insisting he had been rented room 490. The agents could reasonably conclude the defendant was trying to elude them by entering an empty room and, when confronted, insisting it was his assigned room. Based on "the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime." *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992) (internal punctuation removed).

Once the defendant was lawfully arrested, the agents were permitted to search his duffle bag as a search incident to arrest. The bag was within the defendant's immediate control, and the search was conducted contemporaneously with the arrest.

Once the defendant and his bag were transported to the border patrol station, the agents conducted a valid inventory search. This search was conducted in accordance with the agents' standard procedures to safeguard the owner's property and protect the agents.

The defendant argues there is substantial evidence indicating he did not rent room 241. The motel's records indicate the room was rented by Dagoberto Perez and Jose Perez.

The motel security video shows the defendant at the counter paying with five bills. Assuming these were twenty-dollar bills and his room cost $88 per night, the video is consistent with the defendant's statement that he paid for only one room – room 104. The agents, however, did not have access to this evidence when they arrested the defendant. Accordingly, it is not relevant to the probable cause calculation. *See United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005) ("Facts uncovered after the arrest are irrelevant."). The manager might have been mistaken when she told Ayala the defendant paid for room 241, but as long as it was reasonable for Ayala to rely on the manager's statement (and it was), the statement may be properly included in the probable cause analysis. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004) ("[A]n officer may have reasonable suspicion or probable cause even where his reasonable understanding of the facts turns out to be mistaken . . . .").

The defendant further argues the manager's identification of the defendant violates due process pursuant to *Neil v. Biggers*, 409 U.S. 188, 198 (1972). *Biggers*, however, is inapposite to the instant motion.

In *Biggers*, the Supreme Court held the admission of evidence of an identification could violate due process if suggestive out-of-court procedures created a likelihood of misidentification. *Id.* In that case, the victim testified at trial that she identified the defendant at a show-up as the man who raped her. *Id.* The Court held that while a show-up procedure is more suggestive than a line-up, the victim's identification did not violate the defendant's due process rights because the identification was reliable under the totality of the circumstances. *Id.*

In this case, although Ayala testified that the manager "pointed out the defendant" to him, there was no suspect identification like the one analyzed in *Biggers*. According to Agent Ayala, the manager approached him and said a man was just then paying for room 241. Ayala then walked into the lobby area and looked at the man who was then conducting a transaction at the front counter.

Unlike *Biggers*, the manager did not identify the defendant as someone she recognized because she saw him sometime in the past. (In fact, there was no testimony that the manager even saw the defendant's face.) She simply told Ayala what was happening at the front desk. Ayala himself went to the front desk and observed the man at the counter for future identification purposes. *Biggers* does not apply here.[1]

RECOMMENDATION:

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court: DENY the Motion to Suppress evidence for lack of probable cause to arrest and because the manager's identification was tainted by an unduly suggestive procedure. This Report and Recommendation is being faxed to all counsel on this date. Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation. If specific objections are not timely filed, the party's right to de novo review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 900 (2003). If objections are filed, they should be directed to the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 25th day of March, 2008.

/s/ Glenda E. Edmonds
Glenda E. Edmonds
United States Magistrate Judge

---

[1] In all fairness to the defendant, the agent's report gives a somewhat different version of these events. In the report, Ayala states that the manager "told me that an individual had just re-paid (in cash) for the rent of room # 241 (the target room)." Then she "physically pointed out who this individual was." Ayala testified it is not his intention to make his reports misleading, but he conceded they sometimes contain mistakes.